UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAMELA L. MACKENZIE, )
)
          Plaintiff, )
)
    v. ) No. 04 C 4070
)
JOHN POTTER, Postmaster General of the )
United States Postal Service, )
)
          Defendant. )
)

## MEMORANDUM ORDER AND OPINION

MARVIN E. ASPEN, District Judge:

Presently before us are cross-motions for summary judgment filed by Plaintiff Pamela L. MacKenzie and Defendant John E. Potter, Postmaster General of the United States Postal Service ("USPS"). MacKenzie alleges that a supervisor subjected her to a hostile work environment, resulting in her constructive discharge. The USPS, on the other hand, contends that MacKenzie did not suffer any tangible employment action and that the *Ellerth/Faragher* defense shields it from liability. For the reasons set forth below, we grant the USPS' motion and deny MacKenzie's motion.

I.    **SUMMARY OF THE FACTS**

Beginning in January 1986, MacKenzie worked for the USPS as a general expediter on an overnight shift at the Palatine Processing and Distribution Center. (Pl.'s Facts ¶¶ 6-7; Def.'s Facts ¶ 2.) Although not her primary supervisor, Edgar Collins supervised MacKenzie periodically and when she worked overtime.[1] (Pl.'s Facts ¶ 12; Def.'s Facts ¶ 4; Pl.'s Resp.

---

[1]The parties apparently agree that Collins was MacKenzie's "supervisor," rather than simply a co-worker, for purposes of our analysis.

1

Def.'s Facts ¶ 4.) Alan Lipschultz was the USPS Manager of Operations for MacKenzie's shift. (Pl.'s Facts ¶ 6-7; Def.'s Facts ¶ 3.)

In October 1996, Sheila Winterpacht, another female USPS employee, complained to Lipschultz that Collins was sexually harassing her.[2] (Pl.'s Facts ¶ 13.) In response, Lipschultz confronted Collins on November 16, 1996. (*Id.*) According to Lipschultz's notes from that meeting, Collins acknowledged that he spoke with Winterpacht and may have touched her hand, but that he did so in a friendly manner without any sexual intent. (Pl.'s Facts ¶ 14; Lipschultz Dep. at 11-14, Ex. 1.) Lipschultz asked Collins to prepare a statement and counseled him to address Winterpacht on a professional basis only. (Pl.'s Facts ¶ 14; Lipschultz Dep. at 13, Ex. 1.) After speaking with Collins, Lipschultz neither further investigated Winterpacht's allegations, nor disciplined Collins.[3] (Def.'s Resp. Pl.'s Facts ¶ 16.)

That same month, and continuing for approximately eight or nine months, Collins began making comments of a sexual nature to MacKenzie. (Pl.'s Facts ¶¶ 17-18, 20; MacKenzie Dep. I Ex. 57.) According to MacKenzie, such comments included: "When are you going to give me some?"; "Try it, you'll like it"; and "Come and sit on my lap and let's see what pops up." (Pl.'s Facts ¶¶ 17-18; MacKenzie Dep. I Ex. 57.) He also asked if she breastfed her son when he was an infant. (Pl.'s Facts ¶ 20; MacKenzie Dep. I Ex. 57.) Collins repeatedly grabbed MacKenzie and attempted to pull her into a room located near the lower dock time clock. (Pl.'s Facts ¶ 19; MacKenzie Dep. I Ex. 57.) On one occasion, Collins held MacKenzie in a bear hug, kissing all over her face while she struggled to get free. (Pl.'s Facts ¶ 23; MacKenzie Dep. I Ex. 57.)

---

[2] In her Statement of Undisputed Material Facts, MacKenzie refers to and relies upon an October 18, 1998 written statement prepared by Winterpacht detailing her interactions with Collins. (Pl.'s Facts ¶ 13; Lipschultz Dep. Ex. 2.) As the USPS points out, that statement is incomplete, unsworn and constitutes hearsay. (Def.'s Resp. Pl.'s Facts ¶ 13.) Because the document is inadmissible hearsay, we cannot consider it for summary judgment. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995).

[3] Although MacKenzie states that Lipschultz did not interview Winterpacht, the record does not support such an inference. (Pl.'s Facts ¶ 16.) Lipschultz testified that he did not recall whether he interviewed Winterpacht prior to the meeting with Collins. (Lipschultz Dep. at 13.)

MacKenzie further claims that she was denied requested time off because, as Collins allegedly put it, she was "not being nice" and "not giving him anything." (Pl.'s Facts ¶¶ 21, 24; MacKenzie Dep. I Ex. 57.; MacKenzie Dep. II at 73-74.) The "last straw" occurred on June 9, 1997, when Collins ate MacKenzie's lunch and then asked: "Hey, baby, when are you gonna give me some pussy?"[4] (Pl.'s Facts ¶ 26; MacKenzie Dep. I Ex. 57.)

Outraged by Collins' final comment – and having been unsuccessful with her earlier attempts to get Collins to stop his harassing behavior – MacKenzie immediately complained to two supervisors, who instructed her to contact Lipschultz. (Pl.'s Facts ¶¶ 25, 27.) She did so the following evening. (*Id.* ¶ 28.) Though there is some disagreement about what information MacKenzie provided Lipschultz, the parties agree that she told him that Collins had been harassing her generally and specifically described the most recent offensive comment. (Pl.'s Facts ¶ 28; Def.'s Facts ¶ 8; Def.'s Resp. Pl.'s Facts ¶ 28.)

On June 11, 1997, Lipschultz held a meeting with MacKenzie and Collins. (Pl.'s Facts ¶ 29; Def.'s Facts ¶ 9.) At that time, MacKenzie informed Lipschultz that "Collins had been bothering her for some time, that he had been asking her to 'give him some,' and that Collins' 'pussy' comment was the last straw." (Def.'s Facts ¶ 9a.) Collins responded that he and MacKenzie had a history of exchanging sexual comments, which MacKenzie denied. (*Id.*) When asked for further detail, she stated that Collins had also grabbed her. (*Id.* ¶ 9b.) MacKenzie told Lipschultz that she would like him to do whatever was appropriate, but that she specifically wanted Collins to apologize and to leave her alone. (*Id.* ¶ 9c.) Collins apologized for saying anything that offended her. (*Id.* ¶ 9d.) Lipschultz informed them that he would take care of the situation and chastised Collins for his unacceptable behavior, reminding him that "our supervisors can't speak to people like that." (*Id.* ¶ 9e.) Lipschultz did not investigate MacKenzie's allegations further, nor did MacKenzie experience any additional sexually

---

[4]Though conceding that MacKenzie suffered a hostile work environment for purposes of its motion, the USPS denies the allegations against Collins with respect to MacKenzie's motion. (Def.'s Resp. Pl.'s Facts ¶¶ 17-24.)

3

harassing conduct from Collins. (Pl.'s Facts ¶ 30; Def.'s Facts ¶ 10; Lipschultz Dep. at 29.)

The following evening, MacKenzie observed Collins silently glaring at her while nodding his head up and down. (Pl.'s Facts ¶ 31; Def.'s Facts ¶ 11.) Nervous about this behavior, she complained to Lipschultz, who said he would handle it. (Pl.'s Facts ¶ 31; Def.'s Facts ¶ 11.) MacKenzie testified that she did not recall any additional conduct that concerned her. (Def.'s Facts ¶ 12; Pl.'s Resp. Def.'s Facts ¶ 12.) From June 16 through June 19, MacKenzie missed work per her doctor's orders due to bronchitis. (Pl.'s Facts ¶ 34; Def.'s Facts ¶ 15.) MacKenzie worked sporadically between June 20 and July 3, 1997. (Def.'s Facts ¶ 17.)

On June 18, 1997, Lipschultz issued Collins a disciplinary letter for conduct unbecoming a postal officer for "making comments of a sexual nature" to MacKenzie. (Pl.'s Facts ¶ 32; Def.'s Facts ¶ 13.)

On June 20, MacKenzie submitted a letter to Lipschultz memorializing her allegations against, and their meeting with, Collins. (Pl.'s Facts ¶ 33; Def.'s Facts ¶ 16.) In her letter, she informed Lipschultz that Collins "tried to pull [her] into the room by the lower dock time clock" and added that "[t]here are witnesses to a lot of these incidents." (Pl.'s Facts ¶ 33; Def.'s Facts ¶ 16; MacKenzie Dep. Ex. 3.) She then asked Lipschultz "to address the situation more seriously, as she no longer felt safe." (Def.'s Facts ¶ 16; Pl.'s Facts ¶ 33.) On July 3, MacKenzie wrote Lipschultz another letter, reiterating that she felt uncomfortable working with Collins and feared retaliation because he said he was "very upset with [her] for jeopardizing his job." (Pl.'s Facts ¶ 33; Def.'s Facts ¶ 16; MacKenzie Dep. Ex. 5.)

MacKenzie did not return to work for the USPS after July 3. (Def.'s Facts ¶ 18.) Beginning that month, MacKenzie submitted a series of notes from her doctor, Dr. Sarantos, excusing her from work and routinely commenting that she was "totally disabled." (Def.'s Facts ¶¶ 21, 23, 28-29, 32, 34, 43, 46.) She was treated by a psychiatrist, Dr. Faiza Kareemi (Pl.'s Facts ¶ 42) and began regularly seeing a psychologist, Dr. Eldifrawi (Def.'s Facts ¶ 26). After being diagnosed with a depressive disorder due to work-related incidents, MacKenzie received

4

workers' compensation benefits. (Pl.'s Facts ¶¶ 36-37; Def.'s Facts ¶¶ 23-24.)

In July or August 1997, the USPS offered MacKenzie a limited-duty assignment in her same position, but without Collins as a supervisor for 30 days. (Pl.'s Facts ¶ 38.) The USPS later sent two letters dated August 19 and 28 informing MacKenzie that she was absent without leave since July 5, 1997, and threatening disciplinary action in the absence of a satisfactory response. (Pl.'s Facts ¶ 39.) In November, and at the recommendation of Dr. Kareemi, the USPS evaluated the possibility of reassigning Collins and MacKenzie to separate buildings. (*Id.* at ¶¶ 42-44.) On December 1, 1997, Dr. Kareemi advised the USPS that MacKenzie could return to work in her same position as long as Collins worked in a different facility. (Def.'s Facts ¶ 31.) Around that same time, MacKenzie filed a discrimination charge with the USPS EEO office. (Pl.'s Facts ¶ 45; Def.'s Facts ¶ 33.)

By letter dated February 12, 1998, Lipschultz informed MacKenzie that Collins had transferred to another location and ordered her to return to her regular assignment. (Pl.'s Facts ¶ 47; Def.'s Facts ¶ 35.) In response, Dr. Eldifrawi told the USPS that MacKenzie could return on the day shift only because of her emotional state. (Pl.'s Facts ¶¶ 48, 50; Def.'s Facts ¶ 36.)

On March 4, 1998, Lipschultz again instructed MacKenzie to return to her same job, reiterating that Collins no longer worked at the Palatine facility. (Pl.'s Facts ¶ 53; Def.'s Facts 38.) Later that month, the Department of Labor, Office of Workers Compensation Programs ("OWCP") confirmed for MacKenzie that this job offer was "found by OWCP to be suitable to your work capabilities" and would remain open for thirty days. (Def.'s Facts ¶ 39.)

On May 5, Dr. Eldifrawi informed the USPS that MacKenzie's condition had deteriorated and that she could not return to the night shift or the Palatine facility. (Pl.'s Facts ¶ 54; Def.'s Facts ¶ 41.) Dr. Eldifrawi further stated that any conforming assignment would nonetheless be on a trial basis to determine if MacKenzie would be able to return to the USPS at all.

On May 20 and 28, 1998, the USPS "sent MacKenzie letters indicating it considered her

5

absent without leave (AWOL) from her scheduled tour of duty and threatened to initiate discipline, including terminating her employment." (Pl.'s Facts ¶ 55; Def.'s Facts ¶ 42.) On June 17, it directed her to undergo a fitness-for-duty examination on June 26 at the Palatine facility's medical unit to determine if she was able to perform her duties. (Def.'s Facts ¶ 44.) The letter further stated that failure to report for the evaluation "may result in disciplinary action." (*Id.*) In response, Dr. Eldifrawi recommended that the exam take place at his office or MacKenzie's physician's office due to the intimidating nature of both the June 17 letter and the evaluation. (Def.'s Facts ¶ 45.) On July 8, the USPS ordered MacKenzie, for the second time, to report for a fitness examination on July 22. (*Id.* ¶ 47.) In its letter, the USPS further advised her that all examinations "will be performed by Postal Service physicians or a Contract Doctor." (*Id.*)

On July 28, the USPS sent a Letter of Intent to MacKenzie addressing her failure to attend the examination. (*Id.* ¶ 48.) It required MacKenzie to provide an excuse for her failure to attend within 5 days and substantiate any claimed illness with proper medical certification. (*Id.*) The letter indicated that failure to provide a satisfactory reply would result in discipline, including possible removal. (*Id.*) On August 19, the USPS directed MacKenzie to report for a fitness evaluation on a third, final date. (*Id.* ¶ 50.) In response, Dr. Eldifrawi yet again recommended the "examination be held in one of MacKenzie's doctors' offices." (*Id.* ¶ 51.)

On September 22, 1998, the USPS issued MacKenzie a 30-day advance notice that she would be terminated for "Failure to Follow Instructions" because she did not provide an acceptable reason for neglecting to appear at any of the three scheduled fitness-for-duty examinations. (*Id.* ¶ 52.) MacKenzie grieved this notice of removal through her union. (*Id.* ¶ 53.) The USPS denied the grievance, which was then slated for arbitration.

Nearly a year later, on December 1, 1999, the USPS and MacKenzie's union entered into a Pre-Arbitration Settlement Agreement ("Agreement"), which provided that: (a) MacKenzie would be scheduled for a fitness exam at the Carol Stream facility, with two weeks' advance

notice; (b) her doctor could attend the evaluation; (c) MacKenzie would provide a narrative report from her doctor in advance of the exam; (d) she would be removed from the USPS if she did not attend or cooperate; (e) she would be scheduled back to work as soon as possible if deemed fit to work; and (f) the USPS would take necessary action if she did not pass the evaluation. (*Id.* ¶ 55.) Dr. Eldifrawi provided his narrative report on December 5. (*Id.* ¶ 56.) On December 17, and as required by the Agreement, the USPS instructed MacKenzie to report on January 7, 2000 for her evaluation. (*Id.* ¶ 57.) On January 6, however, MacKenzie notified the USPS that she would not attend because she had moved and that she could not arrange an evaluation with her doctor present until February. (*Id.* ¶ 58.)

On January 18, the USPS ordered MacKenzie to undergo a fitness examination on February 24 at the Carol Stream facility. (*Id.* ¶ 59.) On January 31, and in response to a letter from a USPS contract physician requesting information about MacKenzie's condition, Dr. Eldifrawi stated that she could not return to the Palatine facility and that quite possibly could never return to employment with the USPS "without running the risk of severe emotional trauma." (*Id.* ¶ 61.) Finally, on February 23, MacKenzie faxed a letter to the USPS, stating that she would not attend the fitness examination because she no longer lived in Illinois and her doctor had a busy schedule. (*Id.* ¶ 64.) On March 10, 2000, the USPS sent MacKenzie a second thirty day advance Notice of Removal for "failure to follow instructions." (Pl.'s Facts ¶ 59; Def.'s Facts ¶ 66.)

II.     **STANDARD OF REVIEW**

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

7

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986) (quotation marks omitted). Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255. Finally, "[w]e apply the summary judgment standard with special scrutiny to employment discrimination cases, which often turn on the issues of intent and credibility." *Michas v. Health Cost Controls of Illinois, Inc*., 209 F.3d 687, 692 (7th Cir. 2000) (*citing Bellaver v. Quanex Corp*., 200 F.3d 485, 491 (7th Cir. 2000)).

III. **ANALYSIS**

Because the USPS concedes for purposes of its motion that MacKenzie was exposed to a hostile work environment, we initially address whether the USPS has made the requisite showings for the *Ellerth/Faragher* affirmative defense. As that defense is unavailable if MacKenzie suffered a tangible employment action, we must first decide whether her alleged constructive discharge was such an action.

   A. **Constructive Discharge[5]**

To prove that a hostile work environment resulted in a constructive discharge, MacKenzie must show that "the abusive work environment was so intolerable that her resignation was an appropriate response." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134, 124 S. Ct. 2342, 2347 (2004); *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir.

---

[5]MacKenzie alleges that she was constructively discharged from the USPS when, in fact, she was *actually* discharged after failing to appear for multiple fitness examinations. She argues that Collins' conduct and the USPS' inaction rendered her medically unable to return to work, which is "analogous to a constructive discharge." (Pl.'s Memo. at 16.) While we are not entirely convinced the analogy holds water, we will briefly consider the argument that conditions at the USPS prevented her from even attempting to return to work.

8

2004). Unlike the hostile work environment analysis, there is no subjective component to this inquiry. *Suders*, 542 U.S. at 141, 147. Rather, the inquiry is whether "working conditions bec[a]me so intolerable that a reasonable person in the employee's position would have felt compelled to resign[.]" *Id.* The working conditions "must be even more egregious than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress." *McPherson*, 379 F.3d at 441 (*quoting Robinson v. Sappington*, 351 F.3d 317, 336 (7th Cir. 2003)); *see also Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997).

While we assume for purposes of the USPS' defense that a hostile work environment existed, the undisputed evidence does not suggest that: (1) MacKenzie's working conditions were so egregious as of July 1997 that she could not have remained on the job; or (2) unbearable conditions would have arisen to prevent her return after that date. MacKenzie concedes that she did not experience any sexually harassing behavior after Lipschultz counseled Collins on June 11, 1997. MacKenzie did not recall any conduct that disturbed her after the single glaring incident on June 12. Although her letters of June 20 and July 3 indicate that she was unhappy with the USPS' response and was uncomfortable around Collins, the evidence does not demonstrate any further harassment or threatening behavior by him or anyone else at the USPS. In the absence of *any* improper conduct in the weeks after Lipschultz addressed her complaints and before she began leave, we conclude that her refusal to return to work (or even to appear for fitness examinations) was not "an appropriate response."[6] *Suders*, 542 U.S. at 134. Indeed, she refused to return to work even when the USPS assured her that Collins would not be her supervisor for at least thirty days and when it later informed her that he transferred.[7] Finally, the

---

[6]We do not mean to belittle MacKenzie's claim that she was emotionally traumatized by Collins' behavior. Because the constructive discharge inquiry is objective, however, we must focus our analysis on the working conditions and a reasonable person's reaction thereto, rather that MacKenzie's personal response.

[7]In her brief, MacKenzie claims that the thirty-day limited-duty offer to return to work was "unenforceable." (Pl.'s Memo. at 15.) Neither her Statement of Facts, nor any supporting

mere presence of Collins in her workplace – to the extent he would have been present – could not alone warrant a constructive discharge under these circumstances. *See McGowan v. Palmer House Hilton Hotel Co.*, No. 00 C 0733, 2000 WL 1222196, at *6 (N.D. Ill. Aug. 24, 2000).

Moreover, there is no evidence that her working conditions would have deteriorated had she returned, even if Collins was her supervisor. In essence, her attempted analogy poses an unworkable hypothetical: because she refused to return to the USPS, she cannot prove that her environment would have been intolerable had she done so, particularly as conditions had improved prior to her leave.[8] *See McGowan*, 2000 WL 1222196, at *8 (finding that plaintiff's allegations that the perpetrator "could still harass her are merely speculation"). In sum, the undisputed evidence demonstrates that the USPS did not constructively discharge MacKenzie.

In response to the USPS' motion, MacKenzie claims that Collins took a tangible employment action against her because he would require her (but not other employees) to request time off by visiting his office and because he would not always approve such requests. (Pl.'s Resp. Opposing Def.'s Mot. at 2-3.) As the USPS pointed out, there is no evidence to support that such actions would rise to the level of a tangible employment action. "A tangible employment action constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision

---

evidence, supports the conclusion that the restriction was unenforceable. (Pl.'s Facts ¶ 38.)

[8]We do not rule on the general question whether a plaintiff could *ever* prove that he or she was prevented from returning from leave due to deteriorating working conditions.

We further observe that MacKenzie's lawsuit does not include any claims under the Family Medical Leave Act, Americans with Disabilities Act or similar state regulations. Accordingly, we need not consider whether the USPS' response – including the discipline imposed on Collins and its apparent insistence that MacKenzie return to the same facility on the night shift – was sufficient under such laws. Of course, neither Title VII, nor the ADA, require employers to offer employees their preferred accommodation where another resolution may be legally sufficient. *See Dominicak-Brutus v. Urban Prop. Servs. Co.*, 217 F. Supp. 2d 911, 917 (N.D. Ill. 2002) (employer not required "to take the actions that the [harassment] victim would like him to take"); *Carl v. Parmely*, 188 F. Supp. 2d 991, 1006 (S.D. Ill. 2001) (employer need not "remove a harassing supervisor from his position . . . if other reasonable measures are taken"); 29 C.F.R Pt. 1630, App. § 1630.9 (employer need not offer preferred or best accommodation under ADA if another option is equally reasonable).

causing a *significant* change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 2268 (1998) (emphasis added). Such an action must "cause a substantial detriment to the plaintiff's employment relationship." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 698 (7th Cir. 2001) (*quoting Savino v. C.P. Hall Co.*, 199 F.3d 925, 932 n.8 (7th Cir. 1999)). While she may have been inconvenienced, MacKenzie does not claim that the occasional denial of time off *significantly* affected her pay, accrual or exercise of benefits, or job duties. Thus, she failed to raise a genuine issue of material fact that Collins' refusal to grant her time off dramatically altered her employment relationship. *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 887-888 (7th Cir. 2001) (holding that harasser's refusal to approve plaintiff's travel plan to attend conference was not a tangible employment action because "not everything that makes an employee unhappy is . . . actionable") (internal citation omitted); *see Johnson v. City of Chicago*, No. 02 C 5684, 2004 WL 2902225, at *4 (N.D. Ill. Dec. 15, 2004) (concluding that termination of plaintiff's annual leave did not materially affect her employment).[9]

### B. *Ellerth/Faragher* Defense

Because MacKenzie did not suffer any tangible employment action, the USPS may assert the *Ellerth/Faragher* defense. To succeed on this affirmative defense, the USPS must show both: "(a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that [MacKenzie] unreasonably failed to take advantage of any preventative or corrective opportunities . . . or to avoid harm otherwise." *Ellerth*, 524 U.S. at

---

[9]Because we decide the constructive discharge claim on the grounds discussed above, we do not consider the USPS' argument that vicarious liability attaches only if the tangible employment action is inflicted by the *harassing* supervisor. (Def.'s Memo. at 14-15.) *See Johnson v. West*, 218 F.3d 725, 761 (7th Cir. 2000). We are not confident that this distinction is entirely valid following the Supreme Court's decision in *Suders*. 542 U.S. at 148-150. There, the Supreme Court emphasized that a constructive discharge may be precipitated by an "official action" but did not hold explicitly that the actor must be the harasser. *Id.* Moreover, we can envision situations where an employer could be liable for the actions taken by a non-harassing supervisor. Indeed, and as the *Suders* court approvingly discussed, the Seventh Circuit in *Robinson v. Sappington* precluded an employer from arguing the *Ellerth/Faragher* defense in part because a non-harassing supervisor transferred the plaintiff to a highly undesirable position with a new boss who would make her life "hell" such that it was in her "best interest to resign." *Robinson*, 351 F.3d at 324, 336-337; *see Suders,* 542 U.S. at 150.

765; *see Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951-952 (7th Cir. 2005); *McPherson*, 379 F.3d at 439.

   1.   *Reasonable Steps to Prevent and Correct Harassment*

With respect to the first prong of this test, the USPS must demonstrate that it took reasonable steps to prevent the alleged harassment and to correct it after receiving notice of the wrongful conduct. A common method of showing the exercise of reasonable care to prevent harassment is proof that the employer promulgated an effective "antiharassment policy with complaint procedure." *Ellerth*, 524 U.S. at 765; *Haugerud*, 259 F.3d at 698. Here, neither the USPS, nor MacKenzie, submitted copies of any formal antiharassment policy or other evidence describing the USPS' grievance mechanisms in detail.[10] Nonetheless, the parties agree that the USPS had some system in place for addressing sexual harassment complaints. In fact, MacKenzie admitted that she knew that the USPS had a procedure as of late 1996 for reporting sexual harassment allegations. (Pl.'s Resp. Def.'s Facts ¶ 6; MacKenzie Dep. at 20.) She also testified that she knew of the system due to postings in her workplace. (Pl.'s Resp. Def.'s Facts ¶ 6; MacKenzie Dep. at 20.) Although MacKenzie claims that the system was inadequate, and

---

[10]In her Memorandum and her Response to Defendant's Local Rule 56.1 Statement of Materials Facts, MacKenzie refers to the USPS policy, allegedly as set forth in its Employee Labor Relations Manual ("ELM"). (Pl.'s Memo at 8; Pl.'s Resp. Def.'s Facts ¶ 14, n.1.) Rather than providing that policy to the Court, she included addresses for USPS web sites, which contain numerous links to documents not plainly relevant. Although MacKenzie urges that Lipschultz failed to abide by the ELM procedures, she offers no evidentiary basis for that claim. If she wanted us to consider the ELM materials, she was required to submit them as exhibits. Accordingly, we can neither evaluate the propriety of the policy itself as it may have existed at that time, nor whether Lipschultz followed it.

The USPS supervisor training document also relied upon by MacKenzie does not fill the evidentiary void. A disclaimer on that document clearly states that it "is not equivalent to an official handbook, manual, or policy statement." (Pl.'s Facts Ex. 13.)

All that being said, an employer's failure to comply with the letter of its own investigative procedures does not necessarily render that investigation unreasonable or negligent. *See Williams v. Waste Mgmt. of Illinois, Inc.*, 361 F.3d 1021, 1030-1031 (7th Cir. 2004) (refusing to ignore prompt and effective action taken by employer despite flaws of investigation, which included failure to take notes, to report the incident to human resources, to interview the parties separately, to conduct additional interviews and to impose harsh punishment).

12

that Lipschultz was not properly trained, she offers no proof in support of these allegations. (Pl.'s Memo at 8-10.)

MacKenzie also alleges that the USPS failed to prevent Collins' harassment because it took no action in response to Sheila Winterpacht's earlier complaint. (Pl.'s Memo at 7-10.) MacKenzie contends that if the USPS had properly handled the Winterpacht complaint, Collins would not have become a recidivist. Addressing a similar claim in *Longstreet v. Illinois Department of Corrections*, the Seventh Circuit deferentially reviewed the reasonableness of the employer's response to the *prior* complaint, in which an employee offered to pay a female co-worker for performing certain sex acts. 276 F.3d 379, 382 (7th Cir. 2002). Although the resolution of that incident satisfied the complainant, the plaintiff – a later victim of the repeat offender's – claimed that the employer had a further duty to continue the investigation and perhaps prevent her eventual harassment. *Id.* In rejecting that argument, the Seventh Circuit determined that the employer's response "was not obviously unreasonable" and added that:

> we cannot conclude that an employer is subject to what amounts to strict liability for every second incident of harassment committed by an employee, especially when the first incident was far less serious than the second.

276 F.3d at 383.

We likewise hold that the evidence in this case does not support MacKenzie's claim. After learning of Winterpacht's allegations, Lipschultz questioned and counseled Collins. (Pl.'s Facts ¶ 14.) He ordered Collins to prepare a statement, though it is not clear whether he did so, and instructed him to deal with her on a professional basis only. (Pl.'s Facts ¶ 15.) Although Lipschultz did not continue an investigation, there is no admissible evidence before us that any witnesses existed, and he could not recall whether he interviewed Winterpacht. Moreover, MacKenzie does not claim that Collins continued to harass Winterpacht after Lipschultz reprimanded him.[11] Like the Seventh Circuit in *Longstreet* – and "[s]hort of litigating

---

[11]Of course, as discussed below, the USPS had no reason to know that Collins shifted his attentions to MacKenzie soon after Winterpacht's complaint.

13

[Winterpacht's] situation in [MacKenzie's] case" – we can only conclude that the USPS' response to Winterpacht's complaint "was not patently unreasonable," even if it did not benefit MacKenzie. 276 F.3d at 382-383.

Of course, "[t]he mere existence of [a sexual harassment] policy . . . does not necessarily mean that the employer acted reasonably in remedying the harassment after it has occurred or in preventing future misconduct." *Cerros*, 398 F.3d at 953. We consider, therefore, the reasonableness of the USPS' response to MacKenzie's complaint. While the efficacy of that response is relevant, we must assess "'whether the employer's total response was reasonable under the circumstances as then existed.'" *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001) (*quoting McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996)); *Cerros*, 398 F.3d at 954. In particular, the reasonableness of the response turns on the gravity of the alleged harassment. *Smith v. Sheahan*, 189 F.3d 529, 535 (7th Cir. 1999); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir. 1995).

Here, MacKenzie claims that she informed Lipschultz that Collins verbally harassed and repeatedly grabbed her over the course of several months, but he failed to reasonably investigate her complaint.[12] His investigation consisted almost entirely of the June 11 joint meeting. As Lipschultz acknowledged, he did not speak with any witnesses, or contact the human resources department, EEO office or Postal Inspection Service for assistance. Moreover, as MacKenzie argues, Lipschultz issued Collins a "toothless" warning letter, rather than taking more serious disciplinary action. (Pl.'s Resp. Opposing Def.'s Mot. at 7.)

On the other hand, and as the USPS points out, Lipschultz took immediate – and ultimately successful – corrective action. He met with MacKenzie and Collins to gather information and attempt a resolution the same day he learned of MacKenzie's complaint. Within days, he spoke again with Collins and issued him a sternly-worded disciplinary letter,

---

[12]There is some dispute as to what MacKenzie told Lipschultz about Collins' behavior. For purposes of this motion, we credit MacKenzie's account and assume that she did tell Lipschultz about the alleged instances of physical contact and numerous inappropriate remarks.

commenting that Collins' explanation for the sexual comments was "unacceptable" and that his behavior was "intolerable" and "inexcusable." (Lipschultz Dep. Ex. 4.) He warned Collins that future problems would result in more severe discipline, including "suspensions, reduction in grade or pay or REMOVAL from the Postal Service." (*Id.*) MacKenzie conceded that after the June 11 meeting, Collins never again engaged in any conduct she felt was sexually harassing. (Pl.'s Resp. Def.'s Facts ¶ 10; MacKenzie Dep. at 77.) She also did not recall any other disconcerting comments or behavior after the June 12 glaring incident. (Pl.'s Resp. Def.'s Facts ¶ 12; MacKenzie Dep. at 78.)

Although MacKenzie bemoans Lipschultz's investigation and the level of discipline imposed on Collins, we conclude that the USPS' response was reasonably likely to prevent future harassment, particularly as it did so. *See Gawley v. Indiana Univ.*, 276 F.3d 301, 311-312 (7th Cir. 2001) (affirming dismissal where plaintiff acknowledged that the investigation undertaken and resulting sanction brought an end to harassment). The USPS was not required to take all the actions MacKenzie would have preferred, such as demoting or involuntarily transferring Collins. *Dominicak-Brutus*, 217 F. Supp. 2d at 917; *Carl*, 188 F. Supp. 2d at 1006. We acknowledge that the investigation was minimal, and that our determination would have been easier had Lipschultz attempted to interview witnesses, separated MacKenzie and Collins, and kept MacKenzie informed of the status of the investigation. *See Williams,* 361 F.3d at 1030-1031 (affirming summary judgment where employer's process was imperfect, but not negligent); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004) (same). The USPS "could have done more . . . but this is irrelevant unless [MacKenzie] can present some evidence suggesting that the steps that [the USPS] actually took were not reasonably likely to prevent the harassment from recurring." *Berry,* 260 F.3d at 813. As is often said, "we do not 'sit as a super-personnel department,'" and we need not second-guess the USPS' prompt and effective response under these circumstances. *Id.* at 978 (*quoting Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000)).

15

### 2. *Unreasonable Failure to Take Advantage of Corrective Opportunities*

The second prong of the *Ellerth/Faragher* defense requires a showing that the plaintiff unreasonably failed to take advantage of preventive or corrective measures provided by her employer. *Ellerth*, 524 U.S. at 765. If an employee unreasonably failed to utilize the employer's harassment complaint mechanisms, "she should not recover damages that could have been avoided if she had done so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 806-807 (1998). A plaintiff's unreasonable delay in reporting alleged harassment constitutes failure to take advantage of corrective measures and may preclude her recovery. *See Gawley*, 276 F.3d at 312 (employer established second element where plaintiff neglected to complain about comments for seven months); *Savino v. C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir. 1999) (same, where plaintiff waited four months to report harassment). "The purpose of this requirement is tied to Title VII's primary objective, which is not meant to provide redress but rather to avoid harm." *Gawley*, 276 F.3d at 312.

MacKenzie admits that she did not complain about Collins' behavior until June of 1997 even though Collins allegedly began harassing her in or about November of 1996. (Pl.'s Facts ¶¶ 17, 27-28.) MacKenzie claims that her failure to report the harassment for seven months is justified because: (1) she first attempted to resolve the problem herself; (2) she ignored smaller incidents for a time; (3) she believed the USPS did nothing in response to other complaints against Collins; and (4) she feared retaliation. (Pl.'s Memo. at 12-13.) Although MacKenzie may have simply tried to weather the storm and convince Collins to stop harassing her, these decisions ultimately denied the USPS an opportunity to remedy the situation for seven months. Further, the fact that Collins allegedly began harassing her within weeks of Winterpacht's complaint does not mean that the USPS' response to that complaint was inadequate. She does not claim that she knew details of Winterpacht's complaint, including what discipline Collins received, or that he continued harassing Winterpacht after Lipschultz's investigation. The Seventh Circuit has repeatedly commented that "an employee's subjective fears or confrontation,

unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment." *Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639, 644 (7th Cir. 2000) (*quoting Shaw v. AutoZone, Inc.,* 180 F.3d 806, 813 (7th Cir. 1999)); *see Durkin v. City of Chicago*, 341 F.3d 606, 612-613 (7th Cir. 2003) (observing that plaintiff's "feelings of futility or unpleasantness do no alleviate her duty"); *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 889 (7th Cir. 2001) (rejecting plaintiff's claim that her fear of further harassment prevented her complaint). Like the court in *Gawley*, we conclude that MacKenzie's failure to complain "during seven months of escalating harassment, in combination with the insufficiency of her repeated informal efforts to stop [Collins] constitute an unreasonable failure to take advantage of the [USPS'] corrective procedures." 276 F.3d at 312. As soon as MacKenzie reported Collins to Lipschultz, the sexual harassment ceased, and we have no reason to believe that the result would have been different had she alerted the USPS earlier, as *Faragher* requires. The USPS has demonstrated that there is no genuine issue of material fact and that, as a matter of law, it is entitled to the *Ellerth/Faragher* affirmative defense. Accordingly, we grant the USPS' motion for summary judgment against MacKenzie.

## IV. CONCLUSION

For the reasons set forth above, we hereby grant the USPS' motion for summary judgment and deny MacKenzie's motion. It is so ordered.

                                                  Honorable Marvin E. Aspen
                                                  U.S. District Court Judge

Dated: 4/14/06